**Robert O. MUDGE, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 00–228C.

United States Court of Federal Claims.

Dec. 29, 2004.

---

Robert O. Mudge, pro se, Sparks, Nevada.

Douglas K. Mickle, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., argued for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, Commercial Litigation Branch. Of counsel were Sheryl Williams, Office of General Counsel, Federal Aviation Administration, Washington, D.C., and Melanie Watson, Office of General Counsel, Office of Personnel Management, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This civilian pay case is currently before the court on cross-motions for summary judgment. Plaintiff, Robert O. Mudge, seeks back pay for his service from 1990 through 1995 as an employee of the Federal Aviation Administration ("FAA"). Specifically, Mr. Mudge avers that (1) when he was an employee of the FAA in Alaska, he was entitled to a twelve percent pay differential given to certain federal employees in that state, and (2) he was entitled to retain the higher pay rate during his subsequent reassignment to Nevada.

In 1991, Mr. Mudge submitted a grievance for his pay-differential claim to his union, and the following year he filed a grievance for his pay-retention claim. *Mudge v. United States*, 59 Fed.Cl. 527, 529 (2004). The union pursued only the former claim, which the FAA rejected, and the union declined to invoke arbitration. *Id.* Mr. Mudge next retained an attorney and sought relief from the General Accounting Office, the Merit Systems Protection Board, and the Office of Personnel Management ("OPM"), which claims were denied between 1995 and 1999. *Id.* In April 2000, Mr. Mudge filed a complaint in this court on a *pro se* basis. The court dismissed his complaint for lack of jurisdiction, holding that Subsection (a) of Section 7121 of the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 7121(a),[1] limits a federal employee to administrative remedies for grievances covered by a collective bargaining agreement. *Mudge v. United States*, 50 Fed. Cl. 500 (2001). Mr. Mudge appealed that decision, and the Court of Appeals for the Federal Circuit reversed the dismissal of his claim, holding that the addition of the word "administrative" in a 1994 amendment to Subsection 7121(a) effectively removed a bar to a federal employee's right to seek a judicial remedy. *Mudge v. United States*, 308 F.3d 1220 (Fed.Cir.2002).[2] In addition, the

---

1. Subsection 7121(a) of the CSRA provides in pertinent part:

   (1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d), (e), and (g) of this section, the procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage.
   (2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement.
   5 U.S.C. § 7121(a).

2. The reasoning of the Federal Circuit in *Mudge* has been adopted by the Eleventh Circuit, *Aso-*

court of appeals remanded the issue of whether the terms of the collective bargaining agreement to which Mr. Mudge was subject effected a waiver of his right to a judicial forum by requiring that grievances be submitted to binding arbitration as "the exclusive procedure available to the parties and the employees in the unit for resolving grievances." *Id.* at 1233. On remand, this court decided, among other things, that unions lack the power to divest unit members of their individual right to seek judicial relief and that the collective bargaining agreement covering Mr. Mudge's employment did not constitute a waiver of such a right belonging to Mr. Mudge. *Mudge,* 59 Fed.Cl. at 531–35.

The parties then cross-moved for summary judgment and have fully briefed their positions. A hearing on the cross-motions was held on September 30, 2004, and, at the court's request, the parties submitted supplemental factual materials and briefs regarding OPM's and FAA's pay policies for employees located in Alaska. The government filed a supplement to the record (Def.'s Supp. Record") on October 14, 2004. Mr. Mudge filed a subsequent brief and supplemental materials on October 27, 2004. For the reasons that follow, Mr. Mudge's motion for summary judgment is denied, and the government's cross-motion is granted.

## BACKGROUND[3]

Mr. Mudge was employed as a maintenance mechanic by the FAA. *Mudge,* 59 Fed. Cl. at 529. He initially worked in Reno, Nevada but was reassigned to King Salmon, Alaska, where he worked from January 1, 1990 through March 21, 1992. *Id.* He then returned to Reno for medical reasons and worked there until his retirement on December 31, 1995. *Id.* Throughout all of the relevant time periods, Mr. Mudge was paid the rate for wage grade eleven, step five. Hr'g Tr. at 32. The most salient fact in the case is that he did not receive a twelve percent pay

differential during his service in Alaska. Plaintiff's Proposed Findings of Uncontroverted Fact ¶ 4.

## STANDARD FOR DECISION

Summary judgment may be granted if the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Such circumstances exist where a rational finder of fact could reach only one reasonable conclusion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, a court must resolve any doubt over a factual issue in favor of the non-movant. *Id.* at 587–88, 106 S.Ct. 1348. When entertaining cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the movant. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987).

## ANALYSIS

Mr. Mudge first maintains that he was entitled to receive a twelve percent pay differential during his employment in Alaska. Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") at 2–6; Plaintiff's Reply to Defendant's Motion for Summary Judgment ("Pl.'s Reply") at 16–19. Second, he argues that following his return to Nevada, he was entitled to retain the higher wage rate paid in Alaska. Pl.'s Mot. at 6–11; Pl.'s Reply at 19–22. The government resists both of these propositions. The parties base their respective positions on the Prevailing Rate Systems Act, Pub.L. No. 92–392, 86 Stat. 564 (1972) (codified as amended at 5 U.S.C. §§ 5341–49),[4] and the regulations promulgated and

---

*ciacion De Empleados Del Area Canalera v. Panama Canal Comm'n,* 329 F.3d 1235, 1241 (11th Cir.2003), but rejected by the Ninth Circuit. *Whitman v. Department of Transp.,* 382 F.3d 938, 942–44 (9th Cir.2004).

3. The facts presented here do not constitute findings of fact by the court but rather reflect undis-

puted facts and circumstances unless otherwise noted.

4. The Prevailing Rate Systems Act is codified as Subchapter IV of Chapter 53 of Title 5, relating to federal pay rates and systems. Chapter 53 is set out at 5 U.S.C. §§ 5301–5392. Subchapter IV, 5 U.S.C. §§ 5341–49, constitutes in effect the

policies developed by OPM pursuant to that statute.[5]

### A. *Pay Differential*

■ Mr. Mudge argues that the FAA was required by law to pay all of its wage-grade employees in Alaska a twelve percent pay differential listed in Appendix V of the Federal Personnel Manual System, Federal Wage System, Supplement 532–1 ("FPM Supp.").[6] Pl.'s Mot. at 2–5; Pl.'s Reply at 17. However, Mr. Mudge's analysis overlooks an important, albeit somewhat technical, distinction embedded throughout the applicable laws and policies, namely, the difference between Appendix V, Listing of Agency Special Wage Schedules and Rates Documented Under the Federal Wage System, on the one hand, and Subchapter S11, Special Wage Rate Schedules, and Subchapter S12, Special Rates or Rate Ranges under the Federal Wage System, on the other.

The Prevailing Wage Systems Act, among other things, requires OPM to issue regulations providing for the establishment and development of wage schedules and rates both for prevailing wage employees paid under regular wage schedules and rates and those paid under special wage schedules and rates. 5 U.S.C. § 5343(c)(3). That statute mandates that

> the head of each agency having prevailing rate employees in a wage area shall apply, to the prevailing rate employees of that agency in that area, the wage schedules and rates established by the lead agency, or by the Office of Personnel Management, as appropriate, for prevailing rate employees in that area.

5 U.S.C. § 5343(a)(4). With respect to prevailing wage employees paid under special wage schedules and rates, OPM has promulgated 5 C.F.R. § 532.231 (1990), entitled "[s]pecial rates and special schedules," which provides in pertinent part:

> (a) A lead agency, with the approval of the Office of Personnel Management, may establish special rates or special schedules for use within an area for specific occupations which are critical to the mission of a [f]ederal activity based on findings that:
>
> (1) Serious recruitment and retention problems exist;
>
> (2) Rates on the authorized regular schedule are inadequate for the recruitment and retention of qualified employees; and
>
> (3) Authorization of increased minimum rates under § 532.229 of this subpart will not solve the problems.
>
> (b) Special rates shall be based on industry wage data for the specific occupations. A single rate shall be used when this represents industry practice; five rates with intervals of four percent between successive rates shall be used when rate ranges are used by industry, with the rate of the second step representing the weighted average of the industry rates.
>
> (c) Any special rates established under paragraph (b) of this section shall be shown on the regular schedule which shall indicate each occupation and grade for which the rates are authorized. These rates shall be paid by all agencies having these occupations within the wage area.

---

statutory framework for the "Federal Wage System."

**5.** The prevailing wage system ("WS") primarily applies to federal employees who work in trade and craft positions. 5 U.S.C. § 5342(a)(2). These persons are paid according to their "grades and subdivided into 'steps,'" with the rates of pay for each "step" based on prevailing wage rates for comparable work in local areas. *United States v. Clark*, 454 U.S. 555, 557, 102 S.Ct. 805, 70 L.Ed.2d 768 (1982). *See also Bosco v. United States*, 976 F.2d 710, 711 (Fed.Cir. 1992). By contrast, the General Schedule ("GS") applies to federal employees generally, including supervisory, professional, administra-

tive, and clerical employees. *Clark*, 454 U.S. at 557, 102 S.Ct. 805; 5 U.S.C. § 5331 (incorporating the definition of "employee" set out in 5 U.S.C. § 5102).

**6.** The Federal Personnel Manual has been superseded by the Operating Manual, Federal Wage System (1996), but the contents of FPM Supplement 532–1 have been retained. All of the provisions of FPM Supplement 532–1 on which Mr. Mudge relies appear in identical form in the Operating Manual. For ease of reference, the edition of the FPM Supplement 532–1 published on February 6, 1992 will be cited throughout this opinion unless otherwise indicated.

5 C.F.R. § 532.231 (1990).[7] Pursuant to that regulation, in FPM Supplement 532–1, Subchapter S11, Special Wage Schedules,[8] OPM established "special wage schedules and practices applicable to specific occupations or positions under the Federal Wage System." FPM Supp. at 11–1.

In addition, in the 1996 Update to the Operating Manual, OPM added Subchapter S12, Special Rates or Rate Ranges under the Federal Wage System. Operating Manual at iv. The purpose of Subchapter S12 is "to establish special rates and rate ranges for Federal Wage System employees based on recruitment or retention difficulties." *Id.* at 12–1. The phrase "special rate or rate range" is defined in that subchapter as "a rate or range of rates authorized by OPM for recruitment or retention purposes under subchapter IV of chapter 53 of title 5, United States Code, and § 532.251 of part 532 of title 5, Code of Federal Regulations." *Id.*

In contrast to Subchapters S11 and S12, the special schedules and rates *documented* under the Federal Wage System in Appendix V of FPM Supplement 532–1 were not *established* under the Federal Wage System. Rather, FPM Supplement 532–1 describes the origin of the schedules documented in Appendix V as follows:

There are many special schedules now in use on which determinations have not been made to either continue to pay the employees special schedule rates or to bring them under the regular wage schedules of the wage system. These schedules[,] described in appendix V, have been adjusted under policies and practices of the establishing agency. As an interim measure they are continued as special schedules under the Federal Wage System until they have been reviewed and decisions have been made on the recommendations of the Federal Prevailing Rate Advisory Committee.

FPM Supp. 2–1. As emphasized in Appendix V itself, "[t]his appendix does not include special schedules or rates established by OPM under the Federal Wage System. Descriptions of special practices under these schedules are in subchapter S11." *Id.*, App. V at V–1. The "Special 12 percent Differential Wage Rate for Alaska" applies to "Military Departments and [Department of Defense] Component Installations (specified locations)[;] Department of the Interior, National Park Service (Katmai National Monument), Fish and Wildlife Service (Cold Bay)." *Id.* at V–2. This differential is in effect a relict of the situation that existed in Alaska prior to enactment of the Prevailing Rate Systems Act in 1972. *See* Def.'s Supp. Record at 140 (Decl. of Mark A. Allen). After the 1972 Act, the earlier pay practices were grandfathered under 5 U.S.C. § 5341(4) which established the policy that "the level of rates of pay will be maintained so as to attract and retain qualified prevailing rate employees." Employees of the FAA were not covered by the pre–1972 area differential wage schedules in Alaska.[9] Importantly, because the "Special 12 percent Differential Wage Rate for Alaska" documented in Appendix V was not established pursuant to 5 C.F.R. § 532.231(b), FAA was not required to pay its employees that differential rate under paragraph (c) of that section. *Compare* FPM Supp.App. v. at V–1 to V–2, *with* 5 C.F.R. § 532.231(c) ("These rates [established under paragraph (b) of this section] shall be paid by all agencies having these occupations within the wage area.") (quoted in full, *supra*, at 366). *See* Def.'s Supp. Record at 140–41 (Decl. of Mark A. Allen).

In short, there is no genuine dispute of material fact respecting Mr. Mudge's pay differential claim, and the government is entitled to judgment as a matter of law that the FAA was not required to pay Mr. Mudge a

---

7. In 1991, Section 532.231 appeared in identical form as Section 532.251. *See* 5 C.F.R. § 532.251 (1991). The former section will be cited throughout this opinion.

8. In the 1996 republication to what became known as the Operating Manual, Federal Wage System, Subchapter S11 is captioned "Special Wage Rate Schedules."

9. Apparently in 2001, OPM expanded its use of the differential-pay practice for the Department of the Interior to additional locations in Alaska, but it has not extended this authorization further to other agencies. Def.'s Supp. Record at 141 (Decl. of Mark A. Allen).

twelve percent pay differential during his employment in Alaska.

### B. *Pay Retention*

■ Acting under the authority vested by 5 U.S.C. §§ 5361–66, OPM has promulgated regulations providing for grade and pay retention in certain circumstances and with certain exclusions. 5 C.F.R Part 536 (1992). The particular regulatory provision on which Mr. Mudge relies for his pay-retention claim provides: "Pay retention shall apply to any employee whose rate of basic pay would otherwise be reduced ... [a]s a result of the placement of an employee in a position in a lower wage area or in a position in a different pay schedule." 5 C.F.R. § 536.104(a)(5) (1992). However, one of the exclusions to grade and pay retention states that "an employee serving under a temporary promotion or temporary reassignment may not retain a grade or rate of basic pay held during the temporary promotion or temporary reassignment." 5 C.F.R. § 536.105(b) (1992). A "temporary promotion" or "temporary reassignment" is one "with a definite time limitation, and one which the individual is informed in advance is temporary and would normally require that the individual return to his or her permanent position at the expiration of that" promotion or reassignment. 5 C.F.R. § 536.102 (1992). That exclusion applies to Mr. Mudge's situation.

The employment agreement that Mr. Mudge signed expressly provided that "[t]he employee agrees to remain in the overseas service for at least one tour of duty of 36 months." Pl.'s Mot. Ex. 7 (Employment and Transportation Agreement for Overseas Duty (Oct. 6, 1989)). The agreement also incorporated FAA Handbook 3330.6B, Reemployment, Restoration, and Return Rights.

*Id.*[10] That document in both of its forms provided: "Employees are normally expected to serve two tours. However, the head of an overseas organization may disapprove a second tour and return the employee to his/her parent organization if it is in the best interests of the agency to do so." Def.'s Supp. Record at 154. The document further specified:

(1) When an employee has served two consecutive tours of duty, he/she may at the option of the overseas organization be returned to the parent organization. This option may be exercised on an individual case-by-case basis or by standard rotation policy.

(2) The employee, the overseas organization, and the parent organization may mutually agree to a third consecutive tour with the extension of return rights to the end of such tour.

(3) *At the completion of three tours, an employee must return to the parent organization or forfeit return rights.* An employee who is not covered by a mandatory rotation policy may forfeit return rights and remain overseas indefinitely, but only if his/her request is approved by the overseas organization.

*Id.* (emphasis added). Thus, Mr. Mudge's employment agreement provided for "a definite time limitation," namely, a maximum of nine years, and it also required Mr. Mudge either to return to Nevada at the expiration of the reassignment or to forfeit his return rights, making his reassignment to Alaska "temporary" within the meaning of 5 C.F.R. § 536.102 (1992). For these reasons, Mr. Mudge was not entitled to retain the rate of basic pay he earned in Alaska. *See* 5 C.F.R. § 536.105(b) (1992).[11]

---

**10.** The FAA Handbook was modified by Federal Aviation Personnel Manual Letter 352–1 (May 19, 1993) ("FAPM Letter 352–1"), *available at* http://www.faa.gov/ahr/policy/fapm/fapms/fapm 3521.cfm. The two documents are identical in all respects pertinent to this case, and the modifications are enumerated on the first page of the latter document. For ease of reference, this opinion will cite to the version of FAPM Letter 352–1 attached to Def.'s Supp. Record at 144–75.

**11.** Mr. Mudge also puts forward arguments based upon his collective bargaining and employ-

ment agreements. Pl.'s Mot. at 9–11. Respecting the collective bargaining agreement, none of the articles he highlights support his claims. First, Article 32 of the agreement simply states that "[e]mployees shall be paid in accordance with applicable laws," Pl.'s Mot. Ex. 5; it does not provide a substantive basis for relief. Second, Article 34 references the Fair Labor Standards Amendments of 1974, *id.*, but the record does not demonstrate any violation of that statute. Third, Article 36 cites the statutory and

In sum, Mr. Mudge's claim for pay retention involves no dispute of material fact, and the government is entitled as a matter of law to a judgment that the FAA was not required to pay Mr. Mudge the higher rate of pay he received in Alaska upon his return to Nevada.

## CONCLUSION

For the reasons stated, the government's motion for summary judgment is granted, and Mr. Mudge's cross-motion is denied. The clerk shall enter judgment for defendant. No costs.

IT IS SO ORDERED.

regulatory provisions relating to grade and pay retention, *id.*, but the court has found that these laws were not violated. Regarding Mr. Mudge's employment agreement dated October 6, 1989, quoted in part *supra*, at 368, Mr. Mudge focuses on Paragraph 10, Pl.'s Mot. at 9–10, which states that both parties shall comply with all applicable laws. *Id.*, Ex. 7. That statement does not provide an independent basis for Mr. Mudge's claim. Finally, the remaining miscellaneous statutory provisions to which Mr. Mudge cites, Pl.'s Mot. at 10–11, authorize remedies for certain legal violations, but there is no showing that a legal violation occurred in this case.